[Cite as *Valentine  v. Cedar Fair, L.P.*, 2021-Ohio-2144.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Laura Valentine

    Appellant

v.

Cedar Fair, L.P.

    Appellee

Court of Appeals No. E-20-018

Trial Court No. 2020 CV 0172

**DECISION AND JUDGMENT**

Decided:  June 25, 2021

* * * * *

Sean Buchanan, for appellants.

Holly Marie Wilson, Aaren R. Host, and Justin D. Harris, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Plaintiff-appellant, Laura Valentine, appeals the September 11, 2020 judgment of the Erie County Court of Common Pleas, granting the motion of defendant-appellee, Cedar Fair, L.P., to dismiss her complaint for failure to state a claim upon which relief may be granted.

{¶ 2} For the reasons set forth below, we find that Valentine sufficiently pled her claims for relief, and the written agreement upon which she relies—the Gold Pass Terms and Conditions—contains ambiguous terms. The interpretation of the agreement requires review of evidence outside the four corners of the complaint and cannot be decided on a motion to dismiss under Civ.R. 12(B)(6). Accordingly, we find that the trial court erred in dismissing Valentine's complaint, and we reverse the trial court judgment.

## I. Background

{¶ 3} Laura Valentine purchased a 2020 Season Pass from Cedar Fair, L.P. for use at Cedar Point Amusement Park in Sandusky, Ohio. On April 28, 2020, she filed a class action complaint against Cedar Fair, on behalf of herself and all similarly-situated persons who purchased season passes to any of Cedar Fair's numerous amusement parks. She alleged that the 2020 season pass was intended to be used in 2020, that season was intended to run from at least May through October 2020, Cedar Fair informed season pass holders that its parks were closed due to the COVID-19 pandemic, and it is reasonably anticipated that 2020 season pass holders will not be able to use their season passes during 2020. Valentine further alleged that Cedar Fair retained the money paid for the season passes and was not providing a refund.

### A. Valentine's Claims

{¶ 4} Valentine asserted three claims for relief in her complaint: (1) breach of contract, (2) unjust enrichment, and (3) money had and received.

2.

{¶ 5} In support of her breach of contract claim, Valentine alleged that Cedar Fair offered her a 2020 season pass for a stated price; she accepted the offer by paying the stated price; the parties intended that the 2020 season pass would be used and usable in the 2020 season; she performed all conditions precedent required under the contract or those conditions were waived; Cedar Fair announced that parks were closed due to COVID-19; it was anticipated that parks would not open at all in 2020; in failing to open its parks for all or part of the 2020 season, Cedar Fair has breached its contract with her; and as a result, she has suffered damages.[1]  Valentine sought damages either for the amount collected for the proportionate number of days of the intended 2020 season when the 2020 season pass could not be used, or return of the entire amount paid for the pass, plus interest.

{¶ 6} In support of her unjust enrichment claim—pled alternatively to her breach of contract claim—Valentine alleged that she conferred a benefit on Cedar Fair; Cedar Fair retained the benefit and has not returned the monies paid; the balance of equities favors Valentine because she paid for a full 2020 season pass for use in 2020 and Cedar Fair will not be open for a full 2020 season; and it would be unjust for Cedar Fair to retain the benefit.  Valentine sought restitution or disgorgement in the prorated amount of her payments for all of the days the 2020 season pass cannot be used.

---

[1] Valentine made factual allegations on behalf of proposed class members as well, but for ease of discussion, we refer to her singularly in this decision.

3.

{¶ 7} And in support of her claim for money had and received, Valentine alleged that she paid for her 2020 season pass; the money was intended to be used for her benefit in 2020; she performed all that was required of her by paying for the 2020 season pass; and because of park closures, regardless of fault, Cedar Fair has been unjustly enriched because it has inequitably or wrongfully held money. Valentine sought disgorgement of the money wrongfully held, plus interest.

### B. Cedar Fair's Civ.R. 12(B)(6) Motion

{¶ 8} Cedar Fair moved to dismiss Valentine's complaint under Civ.R. 12(B)(6) for failure to state a claim upon which relief may be granted. It argued that the 2020 season pass was a revocable license governed by its Gold Pass Terms and Conditions, which granted 2020 season pass holders access to *open* rides and attractions on regularly-scheduled operating days. It maintained that those terms and conditions specifically provide that all operating dates and hours are subject to change without notice and all rides and attractions are subject to closings and cancellations for weather or other conditions. Accordingly, Cedar Fair claimed, it did not violate the terms of the season pass when it temporarily altered its operating dates and hours in compliance with government-ordered closures. Despite its position that the terms and conditions govern its obligations, Cedar Fair nevertheless contended that because the pass did not grant Valentine an actual interest in Cedar Fair's property, she had no right to the continued existence of the license and Cedar Fair could revoke the season pass at any time without issuing a refund.

4.

{¶ 9} On Valentine's remaining claims, Cedar Fair argued that those clams exist only in the absence of an enforceable agreement between the parties. Here, it insisted, the terms and conditions govern the rights and obligations of the parties, so Valentine's claims for unjust enrichment and for money had and received fail as a matter of law.

{¶ 10} Valentine opposed Cedar Fair's motion. To the extent that Cedar Fair was taking the position that it could revoke her season pass at will, Valentine emphasized that the Gold Pass Terms and Conditions specifically delineate the circumstances under which Cedar Fair could revoke the pass, and these circumstances were inapplicable here. So, Valentine contended, despite Cedar Fair's claims to the contrary, it could not simply revoke the license at will without offering a refund. To do so would breach the terms of the parties' agreement.

{¶ 11} Valentine also argued that a supervening impossibility—such as the pandemic—may relieve Cedar Fair of its obligation to open the park, however, pass holders would be entitled to restitution in the form of a refund. And to the extent that Cedar Fair maintained that it could change the operating dates and hours without notice at Cedar Fair's unfettered discretion, Valentine argued that the agreement would become unenforceable because Cedar Fair's performance under the terms and conditions would be rendered entirely optional, and therefore illusory. In that case, Valentine maintained, she could proceed on her claim for unjust enrichment.

{¶ 12} Valentine acknowledged that a fair and reasonable reading of the terms and conditions leaves for the possibility that Cedar Fair may close the park occasionally for

5.

special events, due to capacity limits, or for other reasons. But she insisted that the 2020 season was intended to begin in May of 2020, and Cedar Fair could not simply close the park indefinitely without refunding a percentage of the cost of the season pass. Finally, Valentine contended that she properly pled both breach of contract and unjust enrichment claims alternatively without negating the validity of either claim.

{¶ 13} In its reply, Cedar Fair denied that it had revoked Valentine's license, and it pointed out that Valentine did not allege in her complaint that the pass had been revoked. Additionally, it explained that Cedar Point had reopened on July 9, 2020, and Cedar Fair announced that 2020 season passes would be honored in 2021. Cedar Fair noted that this information had been announced on its website, and because Valentine referenced Cedar Fair's website in her complaint, the court could consider the contents of the website in its entirety or take judicial notice of this information. Cedar Fair insisted that Valentine has, therefore, received the benefit of the bargain and her complaint fails to state a plausible claim for relief because she has had access to the park since July 9, 2020.

{¶ 14} Cedar Fair argued again that Valentine failed to identify any particular term or condition that it had breached. It emphasized that the terms and conditions promise only that Valentine could access the park during its operating hours for the 2020 season—it did not commit to a specific opening day, closing day, or length of season. It insisted that Valentine's claim that the park was supposed to be open from May to October 2020, is not found in the Gold Pass Terms and Conditions. To the contrary, no particular hours or days of operation are specified and Cedar Fair is permitted to change

6.

the operating dates and hours without notice. Cedar Fair denied that this discretion rendered the agreement illusory, pointing out that it had not argued that it could eliminate the 2020 season in its entirety. It maintained that the license did not allow Valentine unfettered access to the park, and the unanticipated change in operations due to COVID-19 did not render its obligations illusory.

## C. The Trial Court Judgment

{¶ 15} The trial court granted Cedar Fair's motion to dismiss. It found that the 2020 season pass was a revocable license permitting Valentine to enter onto Cedar Fair's property in accordance with the pass's terms and conditions—it did not entitle Valentine to any contractual rights. It observed that the terms and conditions of the season pass did not identify a specific opening date or operating dates, did not require it to be open any specific day or for a specific number of months, and expressly provided that the operating dates and hours were subject to change. The terms and conditions promised only that there would be a season and that Valentine would be able to gain access to the park subject to the terms and conditions of the license.

{¶ 16} The court concluded that because the terms and conditions allowed Cedar Fair to modify the operating dates, it did not violate those terms and conditions by altering the operating dates and hours due to COVID-19. It rejected Valentine's argument that Cedar Fair's promises under the terms and conditions were merely illusory. And it took judicial notice that the park is currently open and accessible to season pass

7.

holders, so Valentine's allegation that it was anticipated the park would not open in 2020 had proven to be false.

{¶ 17} The court also found that the "threshold" requirement for Valentine's breach of contract and equitable claims "is that Plaintiff's 2020 Season Pass was revoked by Cedar Fair," yet Valentine had failed to allege that her pass had been revoked or that she had requested and was denied a refund by Cedar Fair. In any event, it explained, under Ohio law, Cedar Fair was permitted to revoke Valentine's season pass without compensation. "On this basis alone, Plaintiff's Complaint is insufficient as a matter of law and subject to dismissal."

{¶ 18} Valentine appealed. She assigns a single error for our review:

The trial court erred in granting Defendant's motion to dismiss.

## II. Law and Analysis

{¶ 19} In its sole assignment of error, Valentine claims that the trial court erred in dismissing her complaint. She argues that the 2020 season pass created a contract giving rise to a cause of action for its breach. She maintains that the terms of the parties' agreement entitled her to admission to Cedar Point "on any regularly-scheduled operating day of the season," and her complaint clearly alleges that Cedar Point's season begins in May. She insists that Cedar Fair breached the agreement by failing to open the park until July. While she submits that the plain meaning of a Cedar Point "season" is understood to include May and June, to the extent that the term is undefined, an ambiguity exists as to its meaning, therefore, giving rise to a question of fact. Moreover, she claims that if

8.

Cedar Fair is granted unfettered discretion to change the park's operating dates without notice and without limitation, its performance under the agreement is optional and its promises illusory, preventing the formation of a contract due to lack of mutuality of obligation. Finally, Valentine contends that her complaint sufficiently alleges claims for unjust enrichment and money had and received. If no contract was formed due to the illusory nature of Cedar Fair's promises—or due to impossibility—she is entitled to recovery for those claims.

{¶ 20} Cedar Fair responds that the trial court properly dismissed Valentine's complaint. It maintains that the season pass is a revocable license that did not create a contract or confer contractual rights or remedies. And it insists that it did not violate the terms of the season pass by failing to open in May, the terms specifically state that operating dates and hours are subject to change without notice, and the pass is non-transferable, non-refundable, non-exchangeable, and not valid for cash. Cedar Fair claims that the terms of the season pass do not specify hours or days of operation and do not guarantee that the season will include the period of May through October. It emphasizes that the park is now open and Valentine's pass has been extended to allow access to the park during the 2021 season.

{¶ 21} Cedar Fair also claims that Valentine's arguments are based on the premise that her pass had been revoked, so her failure to allege revocation of her season pass is fatal to her complaint. It denies that the terms of the season pass are illusory because the trial court did not hold that Cedar Fair could eliminate the entire season—just that it was

9.

not required to open on any specific day or operate for specific hours. It claims that what Valentine seeks is unfettered access to the park, and the season pass did not promise her such access. Finally, Cedar Fair argues that the terms of the season pass govern the rights and obligations of the parties, thus her remaining claims fail as a matter of law.

{¶ 22} We review de novo a trial court's decision granting a motion to dismiss under Civ.R. 12(B)(6) for failure to state a claim upon which relief may be granted. *State ex rel. Sands v. Coulson*, Slip Opinion No. 2021-Ohio-671, ¶ 6, citing *Alford v. Collins-McGregor Operating Co.*, 152 Ohio St.3d 303, 2018-Ohio-8, 95 N.E.3d 382, ¶ 10. "A Civ.R. 12(B)(6) motion to dismiss is procedural and tests the sufficiency of the complaint." *NZR Retail of Toledo, Inc. v. Beck Suppliers, Inc.*, 6th Dist. Lucas No. L-15-1179, 2016-Ohio-3205, ¶ 12, citing *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 605 N.E.2d 378 (1992). To dismiss a complaint under Civ.R. 12(B)(6), "it must appear beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to the relief sought." *Ohio Bur. of Workers' Comp. v. McKinley,* 130 Ohio St.3d 156, 2011-Ohio-4432, 956 N.E.2d 814, ¶ 12, citing *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 245, 327 N.E.2d 753 (1975). In considering the motion, the court must accept as true all factual allegations in the complaint and construe any reasonable inferences in favor of the non-moving party. *Alford* at ¶ 10. "In general, a Civ.R. 12(B)(6) motion is viewed with disfavor, rarely granted and reserved for those cases that cannot possibly succeed."

10.

*Alexander Local School Dist. Bd. of Education v. Village of Albany,* 2017-Ohio-8704, 101 N.E.3d 21, ¶ 51 (4th Dist.).

{¶ 23} Typically, in evaluating a motion to dismiss under Civ.R. 12(B)(6), the court may not rely on evidence or allegations outside the complaint. *State ex rel. Ames v. Summit Cty. Court of Common Pleas,* 159 Ohio St.3d 47, 2020-Ohio-354, 146 N.E.3d 573, ¶ 5. It may, however, consider documents attached to or incorporated into the complaint. *State ex rel. Washington v. D'Apolito,* 156 Ohio St.3d 77, 2018-Ohio-5135, 123 N.E.3d 947, ¶ 10, quoting *NCS Healthcare, Inc. v. Candlewood Partners, L.L.C.*, 160 Ohio App.3d 421, 2005-Ohio-1669, 827 N.E.2d 797, ¶ 20 (8th Dist.). To that end, a court need not accept as true allegations in a complaint that are contradicted by documents attached to the complaint. *D'Apolito* at ¶ 10.

### A. The season pass is a revocable license *and* a contract, the breach of which is actionable.

{¶ 24} The trial court held that the season pass was a revocable license that could be revoked without compensation and did not grant Valentine contractual rights. While we agree that the pass was a revocable license, we disagree that it could be revoked at will or that it granted Valentine no contractual rights.

{¶ 25} The terms of the season pass specifically characterize the pass as a revocable license, and this is consistent with U.S. Supreme Court and Ohio case law. *See Marrone v. Wash. Jockey Club of D.C.*, 33 S.Ct. 401, 402, 227 U.S. 633, 57 L.Ed. 679 (1913) (concluding that race track ticket was a license subject to revocation); *Stern v. Cleveland Browns Football Club, Inc.,* 11th Dist. Lake No. 95-L-196, 1996 WL 761163,

11.

*5 (Dec. 20, 1996) (recognizing that season tickets were revocable licenses); *Cincinnati v. Hawkins,* 67 Ohio Misc.2d 4, 11, 643 N.E.2d 1184 (M.C.1993) (explaining that a ticket is a revocable license to attend a function or an entertainment event).

{¶ 26} But the case law also demonstrates that the creation of a revocable license may give rise to a contractual relationship. "A contract consists of an offer, acceptance, and consideration." *Fry v. FCA US LLC*, 2017-Ohio-7005, 143 N.E.3d 1108, ¶ 17 (6th Dist.). Whether a contract exists is a matter of law. *Alexander Local School Dist. Bd. of Education* at ¶ 31.

{¶ 27} Valentine alleged that Cedar Fair offered to sell her the season pass, she accepted the offer when she remitted the purchase price, and the parties' obligations were governed by the terms and conditions applicable to the pass. *See id.* (explaining that complaint must allege facts sufficient to prove a set of facts establishing the existence of a contract.). We agree and find that Cedar Fair entered into a contract with Valentine when it sold her the season pass.

{¶ 28} Several cases support our conclusion that the season pass, while a revocable license, gave rise to a contractual relationship. For instance, in *Marrone*, the U.S. Supreme Court recognized that the remedy available to a holder of a ticket who was ejected from a race track was to sue for breach of contract. Similarly, in *Stern*, the Eleventh District held that while no contract existed entitling plaintiff to purchase tickets for a *future* football season, the parties had formed an enforceable contract with respect to appellant's purchase of season tickets for the *current* season. And in *Hawkins,* the court

12.

recognized that while a ticket is a revocable license to attend a function or an entertainment event, "contractual duties arise out of the relationship between the proprietor and the ticket-holder in that the proprietor must perform or respond in damages for breach of his contract * * *." *Id.* at 11. The court explained: "A ticket, in that instance, is a memorandum of the agreement between the proprietor and the ticket-holder." *Id.*

{¶ 29} But even more factually analogous here is *Scales v. Six Flags, Inc.,* 11th Dist. Portage No. 2003-P-0043, 2004-Ohio-4385. There, the plaintiff purchased a season pass to Six Flags. The plaintiff argued—and the Eleventh District agreed—that by purchasing the season pass, the plaintiff formed a binding contract with the amusement park, the terms of which were set forth in the terms and conditions applicable to season passes. *Id.* at ¶ 12. We, too, find that a contract exists here.

{¶ 30} Finally, the terms and conditions make clear that Cedar Fair could not simply revoke the season pass at will for no compensation. The Gold Pass Terms and Conditions delineate the circumstances under which the pass may be revoked without compensation:

> Any attempt to gain admission using a Gold Pass by a guest to whom the pass was not originally issued will result in immediate confiscation of the pass without refund.
>
> * * *

13.

A Gold Pass may be revoked without refund and the Passholder removed from the park for any misuse, failure to abide by applicable terms and conditions or conduct detrimental to the park, including theft of property or services, violation of Federal, State and Local laws, assisting any person to obtain unauthorized entry, violation of park rules, safety procedures, vandalism, disorderly conduct, intoxication, and possession of intoxicating liquors (except as properly purchased within the park with valid identification and used in a responsible manner), drugs and weapons.

Cedar Fair has not alleged that Valentine participated in any conduct that could subject her pass to revocation under the terms and conditions.

{¶ 31} Accordingly, we conclude that while the season pass constituted a revocable license, Valentine and Cedar Fair also formed a contractual relationship when Valentine purchased that pass, the terms of which were set forth in the Gold Pass Terms and Conditions. A cause of action may lie for breach of those terms and conditions.

### B. Valentine properly pled a breach-of-contract claim.

{¶ 32} In addition to incorrectly concluding that the purchase of the season pass provided Valentine with no contractual rights, the trial court also inaccurately summarized the crux of Valentine's breach-of-contract claim when it concluded that Valentine's complaint was insufficient as a matter of law.

{¶ 33} The court assumed that Valentine had claimed that Cedar Fair breached the agreement by failing to refund her season pass ("Plaintiff claims that Cedar Fair's failure

14.

to give a refund breaches its contract with Plaintiff and the purported class"). It held that a threshold requirement of Valentine's claim was that Cedar Fair revoked her season pass—a fact she failed to plead ("The threshold requirement in all three of [her] claims is that Plaintiff's 2020 Season Pass was revoked by Cedar Fair. However, Plaintiff's Complaint does not contain a single allegation that Cedar Fair revoked her 2020 Season Pass"). The trial court misunderstood Valentine's argument.

{¶ 34} What Valentine actually claimed in her complaint is that Cedar Fair breached the agreement by failing to open in May—the month she claims that a Cedar Point season begins. The *remedy* she sought was a refund, or prorated refund, of the purchase price of the pass.

{¶ 35} "The elements of a breach of contract claim are the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Transition Healthcare Assoc., Inc. v. New London Healthcare*, 6th Dist. Huron No. H-10-023, 2012-Ohio-3411, ¶ 13, citing *Doner v. Snapp,* 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994). To succeed on a breach-of-contract claim, a plaintiff must present evidence on all of these elements. *Id.*

{¶ 36} Here, Valentine alleged that Cedar Fair offered her a 2020 season pass for a stated price; she accepted that offer by paying the stated price; the parties intended that the 2020 season pass would be used and useable for the 2020 season—which, Valentine alleged, was May through October 2020; she performed all conditions precedent required under the contract or such conditions were waived; Cedar Fair announced that its parks

15.

were closed; and "[i]n failing to open its parks for all or part of the 2020 season, Defendant has breached its contract with Plaintiff * * *."

{¶ 37} The allegations in the complaint sufficiently set forth each element of a claim for breach of contract, and the trial court erred in concluding otherwise.

### C. The meaning of certain terms requires resolution by a fact-finder.

{¶ 38} Despite concluding that Valentine's failure to allege that Cedar Fair revoked her season pass was fatal to her complaint and that the pass did not give rise to contractual rights, the court went on to determine that Cedar Fair did not violate the Gold Pass Terms and Conditions. It held that under the terms of the agreement, Cedar Fair promised only that there would be a 2020 operating season—it did not make any promises regarding the length of the season or identify specific operating dates or an opening date. To the contrary, the court held, the agreement provided Cedar Fair discretion to change all operating dates and hours without notice.

{¶ 39} The Gold Pass Terms and Conditions provide, in pertinent part:

> A Cedar Fair L.P. Gold Pass is valid only at the park from which it was issued and grants a revocable license to the registered holder for admission and use of all open rides (unless restricted by conditions which could ultimately prohibit someone from riding safely, including but not limited to height, weight, age, physical limitations such as pregnancy and heart conditions, or observed inappropriate behavior), shows and attractions on any *regularly-scheduled operating day of the season* to the amusement

park or outdoor waterpark for which it was issued. A Gold Pass is valid for only one visit per day, and a readmission hand stamp is required for same day re-entry. This pass does not include admission to park areas not open to the general public or requiring a separate admission fee. * * *

A Gold Pass is not valid for private events, park buyouts, park closing due to full capacity or special events at which an additional admission fee is charged. *All operating dates and hours are subject to change without notice.* All rides and attractions are subject to closings and cancellations for weather or other conditions. (Emphasis added.)

{¶ 40} The trial court correctly observed that the terms and conditions permit season pass holders to enter the park on any "regularly-scheduled operating day of the season" and they allow Cedar Fair to change the park's "operating dates and hours." However, neither "regularly-scheduled operating day," nor "season" is defined in the terms and conditions, and the terms and conditions say nothing about Cedar Fair's discretion to alter the "season." The language of the agreement leaves unresolved the question: what is a "regularly-scheduled operating day"? And more importantly, what is a "season"?

{¶ 41} "We interpret undefined terms in a contract according to their plain, ordinary meaning unless doing so would create an absurd result." *Columbus Steel Castings, Inc. v. Real Time Staffing Servs., Inc.,* 10th Dist. Franklin No. 10AP-1127, 2011-Ohio-3708, ¶ 18, citing *Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd. of*

17.

*Commrs.,* 152 Ohio App.3d 95, 2003-Ohio-1227, 786 N.E.3d 921, ¶ 40 (7th Dist.); *Alexander v. Buckeye Pipeline*, 53 Ohio St.2d 241, 245-46, 374 N.E.2d 146 (1978). When a contract is ambiguous or unclear, or when circumstances surrounding the agreement give the plain language special meaning, extrinsic evidence is admissible to ascertain the intent of the parties. *Alexander Local School Dist. Bd. of Education v. Village of Albany,* 2017-Ohio-8704, 101 N.E.3d 21, at ¶ 37, quoting *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313–314, 667 N.E.2d 949 (1996).

{¶ 42} In *Scales,* 11th Dist. Portage No. 2003-P-0043, 2004-Ohio-4385, the plaintiff purchased a season pass to Six Flags amusement park. She filed suit for breach of contract and a variety of other claims after observing that certain patrons had been sold "fast lane" passes, which essentially allowed them to jump ahead in line, thereby extending her wait time for various rides. Six Flags moved for summary judgment on plaintiff's claims, which the trial court granted. On appeal, plaintiff argued that the lower court erred in granting summary judgment because, inter alia, the contract included ambiguous language which can only be understood through recourse to extrinsic evidence.

{¶ 43} The court agreed that plaintiff's "purchase of the season pass constituted a binding contract with Six Flags." *Id.* at ¶ 12. It recognized that the terms of the parties' agreement were set forth in the terms and conditions and provided, in relevant part, as follows:

18.

Park capacity and other circumstances may cause Six Flags to limit entry. Your season pass may be used only once each day. If you leave the park and plan to re-enter the same day, you must have your hand stamped at the exit gate. Your season pass is *good* for all rides and attractions except games, arcades and certain rides and attractions which may require additional charges. Admission to certain special events may require an additional charge and may have limited capacity. This season pass is not valid for private parties. Due to ride maintenance and other circumstances, certain rides and attractions (including new rides) may not be open to the public. Rides subject to availability and/or height and weight restrictions. (Emphasis added.) *Id.* at ¶ 15.

{¶ 44} Plaintiff argued that the terms "good" ("[y]our season pass is *good* for all rides") and "availability" ("[r]ides are subject to *availability*") were ambiguous as used in the terms and conditions, thereby creating material issues of fact. She contended that the terms of the agreement could not be determined from the four corners of the contract, "thus its interpretation involves material issues of fact requiring submission to a jury." *Id.* at ¶ 12. The court disagreed. It found that "good" and "availability" as used in the agreement were not ambiguous on their face. In sum, it held that "the 'terms and conditions' represent[ed] a full and final expression of the parties' agreement," and there were "no patent or latent ambiguities in the language of [those] 'terms and conditions.'" *Id.* at ¶ 26.

{¶ 45} In the Gold Pass Terms and Conditions, "regularly-scheduled operating day" and "season" are undefined. Valentine did not allege in her complaint what she believes "regularly-scheduled operating day" means. She did allege in her complaint, however, that it is generally known that a Cedar Point "season" starts in May and ends in October.

{¶ 46} According to www.dictionary.com (last accessed May 3, 2021), "season" has several different definitions. It may mean (1) "one of the four periods of the year (spring, summer, autumn, and winter), beginning astronomically at an equinox or solstice, but geographically at different dates in different climates"; (2) "a period of the year characterized by particular conditions of weather, temperature, etc.: *the rainy season*"; (3) "a period of the year when something is best or available: *the oyster season.*"

{¶ 47} When a provision at issue is susceptible of more than one reasonable interpretation, ambiguity exists. *Alexander Local School Dist. Bd. of Education,* 2017-Ohio-8704, 101 N.E.3d 21, at ¶ 37, quoting *Lager v. Miller-Gonzalez,* 120 Ohio St.3d 47, 2008-Ohio-4838, 896 N.E.2d 666, ¶ 16. Generally, the factfinder must resolve ambiguity. *Id.* Dismissal is not appropriate where interpretation is required to determine the meaning of unclear, ambiguous language because the appellant may be able to prove a set of facts entitling him or her to the relief requested. *Slife v. Kundtz Properties, Inc.,* 40 Ohio App.2d 179, 183-84, 318 N.E.2d 557 (8th Dist.1974); *Alexander Local School Dist. Bd. of Education* at ¶ 37.

20.

{¶ 48} Unlike "good" and "availability" in *Scales,* it is apparent here that "season" holds special meaning in the context of the operation of an amusement park located in Northern Ohio, where the weather is not conducive to its year-round operation, or the term is otherwise ambiguous. Here, Valentine alleged that the Cedar Point "season" runs from May to October.

{¶ 49} "When reviewing a Civ.R. 12(B)(6) motion, courts are confined to the allegations contained in the complaint." *Cooper v. Highland Cty. Bd. Of Commrs.,* 4th Dist. Highland No. 01CA15, 2002-Ohio-2353, ¶ 9, citing *State ex rel. Alford,* 58 Ohio St.2d at 223, 390 N.E.2d 782. It must accept as true the plaintiff's factual allegations and draw all reasonable inferences in favor of the plaintiff. *White v. Pitman*, 2020-Ohio-3957, 156 N.E.3d 1026, ¶ 39 (1st Dist.). Because "season" is ambiguous or holds a special meaning in this context, the trial court was obligated to accept as true Valentine's allegation that the Cedar Point "season" runs from May to October.

**D. The ambiguity of "season" must be resolved to interpret the agreement.**

{¶ 50} The ambiguity of "season" is significant to the interpretation of the Gold Pass Terms and Conditions, and ultimately to Valentine's claim for breach of those terms and agreements. That is because the scope of Cedar Fair's discretion to change the "operating dates and hours" does not necessarily permit it to change or reduce the length of the "season." Discerning the meaning of "season" is necessary to interpreting the agreement.

21.

{¶ 51} In *Slife,* 40 Ohio App.2d at 184, 318 N.E.2d 557, the court recognized that the essence of the defendant's claim in that case was not that plaintiff's complaint itself failed to state a claim, but rather that the written instrument referenced in the complaint "showed an insuperable bar to relief according to [defendant's] construction of the instrument." This required plaintiffs to refute the motion to dismiss by coming forth with their own construction of the instrument. But ultimately, it was the defendant's burden to establish that the writing on its face, "contain[ed] a clear statement that the relief prayed for [was] not merited." *Id.* The court held that the defendant failed to carry that burden.

{¶ 52} We reach the same conclusion here. We find that it is not clear that the Gold Pass Terms and Conditions present an "insuperable bar to relief" here. There is ambiguity to be resolved, which must be left to the trier of fact. *See, e.g., Cooper* at ¶ 9 ("Courts should avoid interpreting * * * written instruments at the pre-trial stage unless the instrument is clear and unambiguous on its face."). Specifically, it must be determined whether—or to what extent—Cedar Fair's discretion to change the park's operating dates and hours also allowed it to change the park's "season." Dismissal under Civ.R. 12(B)(6) was not appropriate.

### E. Valentine properly pled alternative claims.

{¶ 53} The trial court also dismissed Valentine's alternative claims for unjust enrichment and money had and received. Its only explanation for doing so was that Valentine failed to plead that Cedar Fair revoked her season pass. Cedar Fair argues that Valentine's alternative claims must fail because these claims exist only in the absence of

22.

an unenforceable agreement.  Here, it claims, the Gold Pass Terms and Conditions govern the parties' relationship.

{¶ 54} "Unjust enrichment occurs when '(1) a benefit is conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of that benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.'" *Cuspide Properties, Ltd. v. Earl Mechanical Servs.,* 6th Dist. No. L-14-1253, 2015-Ohio-5019, 53 N.E.3d 818, ¶ 60, quoting *Hambleton v. R.G. Barry Corp.,* 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984).  Valentine pled each of these elements.

{¶ 55} Ohio also recognizes an equitable action for money had and received.  *LRC Realty, Inc. v. B.E.B. Properties*, 2020-Ohio-6999, 166 N.E.3d 37, ¶ 16 (11th Dist.). "Under the theory of money had and received, judgment may be rendered against a party who was not a contracting party, but who nevertheless acted to withhold money that in justice and equity belonged to another." *Id.,* citing *Hummel v. Hummel*, 133 Ohio St. 520, 529-530, 14 N.E.2d 923 (1938).  Valentine pled these elements as well.

{¶ 56} We have recognized that a party may plead alternative, inconsistent claims, such as breach of contract and unjust enrichment, without subjecting it to dismissal under Civ.R. 12(B)(6).  *Perrysburg Twp. v. Rossford*, 149 Ohio App.3d 645, 2002-Ohio-5498, 778 N.E.2d 619, ¶ 52 (6th Dist.), *decision modified on denial of reconsideration sub nom. Perrysburg Twp. v. City of Rossford*, 6th Dist. Wood No. WD-02-010, 2002-Ohio-6364, and *aff'd*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44.

23.

{¶ 57} Here, we find that revocation of the license was not required to prove either of Valentine's alternative claims. And Valentine was permitted to plead breach of contract, unjust enrichment, and money had and received even though those claims are potentially inconsistent.

{¶ 58} Accordingly, we find Valentine's assignment of error well-taken.

### III. Conclusion

{¶ 59} The season pass that Valentine purchased from Cedar Fair is a revocable license, but it also created a contractual relationship governed by the Gold Pass Terms and Conditions. Valentine properly pled a breach of the terms and conditions. Moreover, certain language employed in the terms and conditions are ambiguous and subject to interpretation, therefore, requiring resolution by the trier of fact. It was error to dismiss Valentine's claims under Civ.R. 12(B)(6). Despite the fact that a contractual relationship existed that was governed by the Gold Pass Terms and Conditions, Valentine properly pled the alternative claims of unjust enrichment and money had and received.

{¶ 60} We reverse the September 11, 2020 judgment of the Erie County Court of Common Pleas and remand this matter for further proceedings. Cedar Fair is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed.

E-20-018
Valentine v. Cedar Fair,
L.P.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See also 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.          _____
                                              JUDGE

Christine E. Mayle, J.        

                              _____
Gene A. Zmuda, P.J.                            JUDGE
CONCUR.

                              _____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.